UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

NICOLE MEKOSCH,                                           CIVIL No. 05-594 DWF/AJB

PLAINTIFF,

                                                         REPORT AND RECOMMENDATION ON
V.                                                       PARTIES' CROSS MOTIONS FOR
                                                         SUMMARY JUDGMENT

JO ANNE B. BARNHART, COMMISSIONER
OF SOCIAL SECURITY,

DEFENDANT.

_____

ETHEL SCHAEN, ESQ., AND THOMAS A. KRAUSE, ESQ., FOR PLAINTIFF NICOLE MEKOSCH

LONNIE F. BRYAN, ESQ., ASSISTANT U.S. ATTORNEY FOR THE DEFENDANT COMMISSIONER OF
SOCIAL SECURITY

_____

## I.      INTRODUCTION

Plaintiff Nicole Mekosch disputes the unfavorable decision of the Commissioner of the Social

Security Agency (Commissioner) denying her claim for a period of disability, Disability Insurance

Benefits (DIB) and Supplemental Security Income Benefits (SSI) under Title II of the Social Security

Act.  This matter is before the court, United States Magistrate Judge Arthur J. Boylan, for a report and

recommendation to the district court on the parties' cross motions for summary judgment.  *See* 28

U.S.C. § 636 (b)(1) and Local Rule 72.1.  Based on the reasoning set forth below, this court

**recommends** that Mekosch's Motion for Summary Judgment [Docket No. **15**] **be denied** and that the

Commissioner's Motion for Summary Judgment [Docket No. 19] **be granted**.

1

## II.   PROCEDURAL HISTORY

Mekosch filed an initial application for DIB and SSI on August 5, 2002, claiming a disability onset date of July 20, 2002.  (T. 58, 62.)  Her application was denied initially and on reconsideration.  (T. 62.)  Mekosch filed a request for an administrative hearing which was granted.  (T. 49, 50.)  A hearing was held before Administrative Law Judge (ALJ) Roger W. Thomas, on January 23, 2004.  (T. 54.)  On August 27, 2004, the ALJ issued an unfavorable decision denying both DIB and SSI.  Mekosch requested review by the Appeals Council.  (T. 11.)  She submitted two exhibits to the Appeals Council for review.  (*Id*.)  On February 15, 2005, the Appeals Council denied the request for review.  (T. 6.) Mekosch filed an action in federal district court requesting that the court review the Commissioner's decision denying her benefits.  Both parties have filed motions for summary judgment and the matter has been referred to the undersigned magistrate judge for a report and recommendation to the district court.

## III.   FACTUAL BACKGROUND AND MEDICAL HISTORY

Mekosch was born on October 4, 1974, and was 29 years old at the time of the administrative hearing.  (T. 58, 17.)  She dropped out of high school in ninth grade, but completed a GED in 1997.  (T. 82.)  She is married with five children ages 14, ten, eight, five and five months (at the time of the administrative hearing).  She has worked in the past as an office assistant manager, cook, cashier, childcare provider, direct care provider, and factory worker.  (T. 88-92.)

She has been diagnosed with fibromyalgia and narcolepsy.  (T. 116.)  In December 1999, an overnight polysomnogram was conducted by Dr. Keith Leavell.  (T. 120.)  The results indicate that Mekosch had slept for 8.4 out of 9.2 hours, with an overall sleep efficiency of 92%.  (*Id*.)  No

significant apneas, hypopneas, or desaturations were noted.  (*Id*.)  The doctor concluded that the test results were "supportive evidence for narcolepsy."  (*Id*.)  He noted that "[b]ased on the clinical correlation, therapy directed at treatment of narcolepsy may prove beneficial."  (*Id*.)

On July 24, 2001, Mekosch presented at the Allina Medical Clinic (Allina Clinic) with a urinary tract infection and a report of abnormal weight loss.  (T. 165.)  Dr. Stewart Sahlberg noted that Mekosch's back was straight and non-tender, her symmetric deep tendon reflexes were normal, as were her heart, lungs, abdomen and psychiatric condition, and there was normal gross motor tones and coordination.  (*Id*.)  His noted that she was mildly distressed.  (T. 163.)  Septra DS[1] tablets were prescribed, as was Wellbutrin,[2] and she was told to return in two weeks for a follow-up visit.  (T. 165.)  It is noted that she was already taking, *inter alia*, Provigil[3] (300mg/once a day) and Flexeril.[4]  (T. 163.)

The next recorded office visit to the Allina Clinic was for September 5, 2001.  (T. 161.)

---

[1]    Spetra DS is s sulfa drug used to "eliminates bacteria that cause various infections, including infections of the urinary tract, lungs (pneumonia), ears, and intestines."  *MedlinePlus Drug Information at*  http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a684026.html.

[2]    Wellbutrin is used to treat depression.  *Id.* at http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695033.html.

[3]    Provigil "is used to treat excessive sleepiness caused by narcolepsy (a condition that causes excessive daytime sleepiness) or shift work sleep disorder (sleepiness during scheduled waking hours and difficulty falling asleep or staying asleep during scheduled sleeping hours in people who work at night or on rotating shifts)."  *Id*. at http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a602016.html.

[4]    Flexeril "a muscle relaxant, is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries."  *Id.* at http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682514.html.

Mekosch appeared at the clinic complaining of a headache, nausea, and generalized upper back pain, which she described as constant and moderately severe.  (*Id*.)  There was only minimal relief with her current medications and home exercise, ice, and heat.  (*Id*.)  It was noted that she was fatigued.  (*Id*.)  The physical exam revealed that she was in acute distress, with tender spots on her head, tender spots through the thoracolumbar spine, with a range of motion diminished by ten degrees in all planes, and psychologically exhibiting a flat affect.  (T. 162.)  Dr. Sahlberg concluded that Mekosch was suffering from a deteriorating tension headache and deteriorating chronic myalgia.  (*Id*.)  Provigil was reduced to 200 mg /twice a day, Midrin was prescribed for her headaches, and Flexeril was discontinued.  (T. 163.)

On October 11, 2001, Mekosch returned to the Allina Clinic complaining of burning with urination and fatigue.  (T. 158.)  She was noted to be in mild distress.  (T. 159.)  There was no tenderness noted in the spine and heart, lungs, and head were normal.  (*Id*.)  Suprapubic tenderness was noted.  (*Id*.)  She was diagnosed with a urinary tract infection, Strepta DS was prescribed,  and she was instructed to return to the office in one week.  (T. 160.)

Mekosch returned to the Allina Clinic on October 26, 2001, and was diagnosed with acute bronchitis, fever, headache, and an acute upper respiratory infection.  (T. 158.)  A strep culture came back negative.  (T. 155.)  Amoxicillin was prescribed and she was told to rest from work.  (T. 158.)

On December 11, 2001, Mekosch had a follow-up appointment with Dr. Sahlberg.  (T. 152.)  Mekosch stated that she had over a fifty percent improvement in her headaches, neck and back pain, and insomnia as a result of her physical therapy sessions.  (*Id.*)  She asked the doctor to recommend

additional therapy sessions.  (*Id*.)  Dr. Sahlberg noted that Mekosch's acute bronchitis had

deteriorated, but that her chronic myalgia and tension headache had improved.  (T. 154.)  She

remained on her previous medications except for the amoxicillin, which was replaced with a

prescription of augmentin.  (*Id*.)  Dr. Sahlberg noted that Mekosch was able to return to work with the

limitation of lifting, carrying, or pulling only under 20 pounds.  (T. 151-52.)

In April 2002, Dr. Leavell noted that Mekosch was suffering from significant depression and

was currently taking Wellbutrin to treat her depression.  (T. 127.)  He noted that she was doing well

with respect to taking Provigil for her narcolepsy and that she had tried Effexor,[5] but that it had negative

side affects.  (*Id*.)  He suggested she take Ultram[6] to help treat her chronic pain and muscle pain.  (*Id*.)

He noted that she was sleeping approximately ten hours each night.  (*Id*.)  On May 10, 2002, it is noted

in the record that Mekosch called the clinic stating that the Ultram samples were working well and that

she needed a refill.  (*Id*.)

On May 8, 2002, Dr. Ben Macedo confirmed that Mekosch was pregnant.  (T. 150.)

Additionally, she was having difficulties with sleeping, fatigue, muscle aches, and poor memory because

she had discontinued her medication due to her pregnancy.  (*Id*.)  Dr. Macedo told her that she could

continue taking Wellbutrin, but that she should stop using Provigil while she was pregnant.  (*Id*.)

On July 25, 2002, Mekosch presented at the Allina Clinic with a sinus infection and headache.

(T. 145.)  She was given a prescription for amoxicillin and told to return in two weeks.  (T. 147.)  Her

---

[5]       Effexor is used to treat depression.  *Id*. at
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a694020.html.

[6]       Ultram "is used to relieve moderate to moderately severe pain."  *Id*. at
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695011.html.

use of Wellbutrin was discontinued.  (*Id*.)  A work ability report, completed on that day by Dr.

Sahlberg, reported that Mekosch would be able to return to work in ten days.  (T. 144.)

In July 2002, Mekosch called the clinic requesting an appointment with Dr. Leavell to talk with

him about possible medication that were safe to take during pregnancy for narcolepsy.  (T. 127.)  She

was informed that there were no medication for narcolepsy that was recommended safe for use during

pregnancy.  (*Id*.)

On July 31, 2002, Mekosch suffered a miscarriage at 20 weeks gestation.  (T. 114.)

On September 5, 2002, Mekosch visited the Allina Clinic for a check-up regarding her

fibromyalgia.  (T. 137.)  It was noted that she had joint swelling, muscle cramps, muscle weakness,

pain and stiffness.  (T. 139.)  Her back was "tender throughout to mild palpitation, flexion, extension,

lateral bending and rotation."  (*Id*.)  Spasms were noted at the 2-3/4 paralumbar musculature.  (*Id*.)

She reported an intolerance to cold and heat.  (*Id*.)  Her mood was listed as depressed with flat effect

and monotone voice.  (*Id*.)  Dr. Sahlberg noted that there was good moderate pain relief using Ultracet

for severe pain, but that the medication caused sedation during the day.  (T. 137.)  There was mild

relief noted with ibuprofen.  (*Id*.)  Bextra[7] was prescribed for pain.  (T. 139.)

On September 17, 2002, Mekosch visited the Allina Clinic complaining of headaches.  (T.

136.)  She was diagnosed with sinusitis.  (T. 137.)  Cefzil[8] was prescribed to combat the infection.  (T.

---

[7]  Bextra is "used to relieve the pain, tenderness, inflammation (swelling), and stiffness caused by arthritis."  *Id.* at http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a602011.html

[8]  Cefzil "is used to treat certain infections caused by bacteria, such as bronchitis and infections of the ears, throat, [and] sinuses."  *Id*. at

136.)  Treatment notes indicate that at that time she denied joint swelling, muscle cramps, muscle

weakness, or pain.  (T. 135.)

On September 23, 2002, Dr. Leavell completed a Sleep Disorders Residual Functional

Capacity Questionnaire.  (T. 122.)  Dr. Leavell noted a diagnosis of narcolepsy and indicated that he

saw Mekosch for follow-up appointments every six months.  (*Id*.)  He notes that the only testing

performed was the sleep analysis in December 1999.  (*Id*.)  He identifies Mekosch's symptoms as

excessive daytime sleepiness, sleep attacks, insomnia, fatigue, disturbance in cognitive function, and

memory impairment.  (T. 123.)  He stated that she was not a malingerer.  (*Id*.)  He noted that emotional

factors contributed to the severity of Mekosch's symptoms.  (*Id*.)  He also noted that she was not

taking medication due to pregnancy and further specifically noted that she was not taking medication

when he stated that he expected the her impairments to last at least 12 months.  (T. 124.)  He stated

that "lifelong patients can achieve improvement with naps [and] medication."  (*Id*.)  The only limitation

the doctor chose from a list of several limitations was:  "may need breaks at unpredictable intervals

during the workday due to spells, adverse effects of medications, etc."  (*Id*.)  He noted that the

anticipated frequency of the breaks would be two to three times a day.  (*Id*.)  He also noted that she

would likely be absent from work about once a month due to her impairments.  (T. 125.)


On October 15, 2002, Mekosch presented at the Allina Clinic for back and muscle pain.  (T.

131.)  Her medical conditions were listed as chronic myalgia deteriorated and tension headache

---

http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a698022.html.

deteriorated.  (*Id*.)  Dr. Sahlberg discontinued her prescription for Bextra and prescribed Baclofen[9] and Vicodin.[10]  (T. 132.)

On October 16, 2002, Mekosch visited Dr. Chris Moellentine at the Behavioral Health Clinic for psychiatric care.  (T. 129.)  Dr. Moellentine noted that Mekosch reported poor concentration, moderately depressed mood, interrupted sleep, and a worsening of her fibromyalgia.  (*Id*.)  He stated that she was suffering from bereavement for the loss of her baby at five months gestation.  (*Id*.)  He reported that Mekosch and her husband were meeting with a counselor for supportive psycotherapy in order to help work through the grieving process for the loss of their child.  (*Id*.)  He noted that Mekosch was not taking any psychotropic medications and that she was concerned that her miscarriage had been caused by her taking her narcolepsy medication, Provigil.  (*Id*.)  He noted that she reported that her narcolepsy was "raging."  (*Id*.)  He also noted that she was "scared" about restarting her narcolepsy medication because she was unsure of whether she and her husband were going to try to have another baby.  (*Id*.)  Dr. Moellentine did restart her on Wellbutrin.  (*Id*.)  He noted that she was taking Vicodin as needed and had been given a prescription for Baclofen.  (*Id*.)

On December 9, 2002, Dr. Mario J. Zarama, M.D., completed a Residual Functional Capacity Assessment.  (T. 186.)  Dr. Zarama determined that Mekosch could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk about six hours in an eight-hour workday, sit for a total of

---

[9]    Baclofen relieves pain and improves muscle movement.  *Id*. at http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682530.html.

[10]    Vicodin is a combination of Acetaminophen and Hydrocodone that is used to relieve moderate to moderately severe pain.  *Id*. at http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601006.html.

about six hours in an eight-hour workday, and unlimited capacity to push or pull. (T. 187.) Dr.

Zarama also determined that the record failed to establish any postural, manipulative, visual,

communicative or environmental limitations, with the exception of a limitation on working with

machinery or heights. (T. 188.) Dr. Zarama noted that there was no statement from Mekosch's

treating physician in the file relating to Mekosch's physical limitations. (T. 192.)

On December 26, 2002, Mekosch underwent an examination by an consulting psychologist,

Dr. Donald Wiger. (T. 166.) Dr. Wiger concluded that Mekosch had features of a pain disorder with

mild reactive depression. He ruled out major depression, dysthymia, or adjustment disorder. (T. 169.)

He stated a GAF of 57.[11] He concluded: "Mekosch is able to understand directions. She is able to

carry out mental tasks with reasonable persistence and pace. She is able to respond appropriately to

co-workers and supervisors. She is able to handle the mental stressors of the work place. Her

concerns which she states are primarily due to physical stressors." (T. 170.)

On January 1, 2003, Dr. Dan Larson, a consulting examiner, completed a psychiatric review

technique form and determined that Mekosch was suffering from a medical impairment of reactive

depression that was non-severe. (T. 171, 174.) He concluded that concentration is adequate,

persistence and pace are reasonable, stress tolerance is adequate, and there has been no deterioration

episodes in a work or work like setting. (T. 185.)

---

[11]    The GAF scale is used to rate an individual's overall psychological, social, and
occupational functioning. American Psychiatric Association, *Diagnosis and Statistical Manual of
Mental Disorders, Text Revision* 34 (4th ed. 2000). The ratings are based on a 100 point scale. *Id.*
A rating of 60-51 indicates moderate symptoms or moderate difficulty in social, occupational, or school
functioning. *Id.*

On January 15, 2003, Mekosch was seen by Dr. Sahlberg at the Allina Clinic for a sinus exam. (T. 209.)  Mekosch reported worsening sinus pressure, congestion, fatigue, malaise and upper back pain.  (*Id*.)  Dr. Sahlberg noted that Mekosch was "recently pregnant."  (*Id.*)  Physical exam revealed tender frontal and maxillary sinuses, supple neck, and upper back tender to mild palpation and moderate movement in all planes.  (T. 210.)  Amoxicillin was prescribed.  (*Id*.)  The Ultracet, Baclofen and Vicodin were discontinued.  (*Id*.)  She was given a referral to an arthritis and rheumatology clinic with an appointment date of April 17, 2003.  (T. 208.)

On March 21, 2003, Mekosch was seen by Dr. Moellentine for a psychiatric progress exam. (T. 222.)  He noted that she was four and one-half months pregnant and was off Provigil and Wellbutrin due to her pregnancy.  (*Id*.)  He reported that she had been denied disability two times and was waiting to appeal the decision.  (*Id*.)  He also reported that she needed to see a rheumatologist for a confirmation of her diagnosis of fibromyalgia.  (*Id*.)  He noted that her depression was moderate and that she was able to organize her life around her narcolepsy and sleep as needed since she was off from work.  (*Id.*)  Dr. Moellentine concluded, "I encouraged her to think about breast-feeding options as certainly if we were to restart medicines it would be preferable that she not be breast-feeding."  (*Id*.)

On the same date, Mekosch saw Dr. Leavell, who explained that she had been doing well on Provigil, but that she was off her medication due to her pregnancy.  (T. 226.)  He noted:  "Overall, she is doing well.  She takes some caffeine for wakefulness and takes naps."  (*Id*.)  He also noted that "she is quite excited because she attended a conference for narcolepsy in Las Vegas and has brought brochures."  (*Id.*)  He stated that he would reinstate her medication with Provigil at the conclusion of her pregnancy.  (T. 225.)

10

On June 25, 2003, Mekosch visited the Allina Clinic complaining of congestion.  (T. 205.)

Amoxicillin was prescribed for acute sinusitis.  (T. 206.)  On July 11, 2003, she was seen by Dr.

Moellentine for a review of her psychiatric progress.  (T. 220.)  He noted that she was eight months

pregnant.  (*Id*.)  He explained that she was not taking any medication except Prevacid and an

occasional Vicodin for her fibromyalgia, "which is rare."  (*Id*.)  She reports that her narcolepsy is

worsening.  (*Id*.)  She reports experiencing cataplexy,[12] "hypnagogic/hypnopompic[13] hallucinations and

myoclonic[14] jerks that are all quite disturbing for her."  She rated her depression as an eight out of ten.

(*Id*.)  Dr. Moellentine noted that Mekosch appeared quite tired in her late term of pregnancy, although

she maintained her alertness during the appointment.  (T. 221.)  He also noted that he would see

Mekosch in three months to evaluate the appropriate time to reinitiate her previous psychotropic

medications.  (*Id*.)

On September 24, 2003, she again visited the Allina Clinic complaining of "increasing spastic,

moderately severe, neck and upper back pain" due to fibromyalgia and chronic myalgia. (T. 204.)

Tenderness was noted in several trigger points along the spine.  (T. 203.)  In addition, Mekosch had

---

[12]    Cataplexy is "a sudden loss of muscle control with retention of clear consciousness that
follows a strong emotional stimulus (as elation, surprise, or anger) and is a characteristic symptom of
narcolepsy ."  *MedlinePlus Medical Dictionary at*
http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=cataplexy.

[13]    Hypnagogic is "of, relating to, or occurring in the period of drowsiness immediately
preceding sleep" and hypnopompic is "associated with the semiconsciousness preceding waking."  *Id.*
at  http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=hypnagogic and
http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=hypnopompic.

[14]    Myoclonic is "irregular involuntary contraction of a muscle usually resulting from
functional disorder of controlling motor neurons."  *Id*. at
http://www2.merriam-webster.com/cgi-bin/mwmednlm.

moderate to significant decrease in range of motion in the cervical and thoracic regions. (*Id*.) Flexeril (or its generic equivalent) was prescribed for muscle spasms and Vicodin for pain. (T. 202.) Dr. Sahlberg instructed Mekosch to exercise in the chief area of complaint and to apply heat. (T. 203.) He noted that she had recently had a baby and had been off of her medication due to pregnancy and breast feeding. (T. 204.)

On November 3, 2003, Mekosch was again seen by Dr. Moellentine for a mental status examination. (T. 218.) Mekosch stated that she was still breast feeding and thus not taking her narcolepsy medication. (*Id*.) She reported an episode of cataplexy where she almost dropped the baby. (*Id*.) She stated that she had learned to hand the baby to someone else when she was getting tired. (*Id*.) She reported still driving, which Dr. Moellentine advised against. (*Id*.) Dr. Moellentine stated that he would support short-term disability, but that after she had her baby weaned, and presumably back on her medication, he would want to reassess her return to work schedule. (*Id*.) He stated: "Although she clearly seems interested in disability, I do not see this as an effort for secondary gain." (T. 219.)

Dr. Moellentine completed a medical assessment of ability to do work-related activities (mental) on this same date. (T. 227.) He determined that Mekosch had a very good ability to follow work rules and function independently, to use judgment, and interact with supervisors; a fair ability to relate to co-workers or deal with the public; and a poor or no ability to deal with work stresses or maintain attention or concentration. (T. 227-28.) Due to poor concentration, exhaustion, sleepiness and depression, she would have a poor or no ability to understand remember and carry out complex job instructions; poor or no ability to understand, remember and carry out detailed, but not complex job

12

instructions; and only a fair ability to understand, remember and carry out simple job instructions.  (T.

228.)  He noted that due to sleepiness, no energy, aching muscles from fibromyalgia, and depression,

she has a good ability to maintain personal appearance, a fair ability to behave in an emotionally stable

manner and relate predictably in social situations, and a poor or no ability to demonstrate reliability.  (T.

229.)  He concluded that she should not work with people or drive for long distances, and be exposed

to only minimal stress.  (*Id*.)  On January 19, 2004, Dr. Moellentine submitted a letter to "clarify the

period of disability."  (T. 230.)  He stated that in his opinion, Mekosch's "period of disability due to the

severity of her medical conditions would begin on [July 15, 2002] with a review of medical

improvement after [July 15, 2004]."  (*Id*.)

On December 23, 2003, Mekosch visited the Allina Clinic complaining of muscle pain.  (T.

195.)  Again, several tender points along the spine were noted.  (T. 198-99.)  Mild to moderate

decrease in range of motion for the cervical and thoracic regions was noted.  (T. 199.)  In addition,

minimal swelling and tenderness to mild palpation was noted for shoulders, wrists, and knees.  (T. 197.)

Dr. Sahlberg reported that the problems of tension headache, chronic rhinitis, narcolepsy and chronic

myalgia were unchanged.  (T. 198.)  A new problem of tendonitis in the hand was reported.  (T. 197.)

He noted that Mekosch was still off some of her medications due to her recent pregnancy and breast

feeding.  (T. 195.)  He noted that she was in the process of weaning her child from breast feeding.

(*Id*.)  Dr. Sahlberg renewed prescriptions for Alavert for allergy symptoms (noting that her allergic

rhinitis was doing better on this medication) and Vicodin for pain as needed.  (T. 198.)

On January 14, 2004, Dr. Sahlberg completed a medical assessment of ability to do work-

related activities (physical).  (T. 231.)  He concluded that Mekosch could not lift over ten pounds

13

because excessive lifting would exacerbate her fibromyalgia. (*Id*.) He also concluded that she could

stand and/or walk or sit for more than a total of four hours because excessive standing, walking or

sitting would also exacerbate her fibromyalgia. (T. 231-32.) He stated that she should never climb,

balance, stoop, crouch, kneel or crawl due to a risk of increased pain and injury working in these

positions. (T. 232.) He also states that her ability to reach, handle, and push or pull are affected by her

impairments. (*Id*.) He indicated that she should be restricted from all listed environmental conditions,

such as height, moving machinery, temperature extremes, chemicals, dusts, noise, fumes, humidity and

vibrations. (T. 233.) He additionally noted that narcolepsy would restrict her ability to work because

she would need rest periods of two to three hours daily and that these periods occur at unannounced

times. (*Id*.)

## V.   TESTIMONY AT ADMINISTRATIVE HEARING

ALJ Roger W. Thomas conducted a hearing on January 23, 2004, in Minneapolis, MN. (T.

262.) Mekosch appeared and testified and was represented by counsel. Dr. Jared Frazin appeared as

a neutral medical expert and Steven Bosch appeared as a vocational expert (VE). (T. 264.)

Mekosch's husband, Jeffery Mekosch, also testified at the hearing. (*Id*.)

Mekosch stated that she did not drive very much and only locally. (T. 271, 276.) She

explained that she gets tired when she drives, but that she knows when she should or should not drive.

(T. 276.) She dropped out of high school in ninth grade but finished her GED several years later. (T.

271.) Her walking is limited due to her fibromyalgia and that she stated she can probably walk around

the block and back before she got too tired and had to sit down. (T. 272.) She has been diagnosed

with tendinitis and this has placed some limitations on what she could do. (*Id*.) Her fibromyalgia has

14

caused pain and stiffness in her hands.  (*Id*.)

She takes Vicodin for the pain.  She said that she would probably be going back on the Wellbutrin, but that she would not be taking the Provigil because of interactions with her birth control medication.  The ALJ questioned why she did not consider other alternative birth control measures, such as her husband using some sort of birth control, and she stated that "they figured the Depro was my best option with my memory and with the narcolepsy." (T. 274.)  Although the Provigil has been helping, she explained, the doctor had to increase the dosage because she was slowly building up a tolerance to the medication.  (T. 275.)

Mekosch said that she sleeps from about 10:00 p.m. to 7:00 a.m. when she gets up to make sure her oldest daughter catches the bus.  (T. 276.)  At that time she wakes her other daughters and then goes back to bed and sleeps until the baby and her five years old wake up at 10:30 a.m.  (*Id*.) She does not feel rested when she wakes, especially if she has experienced hallucinations or sleep paralysis during the night.  (T. 277.)  The ALJ noted that according to the sleep study done in 1999, she had a 92 percent sleep efficiency and had two periods of deep sleep.  (*Id*.)  She stated that she did not remember what the doctors had told her about the sleep study.  (*Id*.)

Mekosch explained that her depression is linked to her chronic pain, secondary to fibromyalgia. (T. 278.)  The severity of the body aches and muscle pain varies from day to day, with some days being much worse than others.  (T. 279.)  The weather and her lack of sleep can adversely affect the pain.  (*Id*.)  She said that on the days where the pain is intolerable, she takes hot baths and uses a heating pad.  (*Id*.)  She only sparingly uses pain medication, about twice a week, because she does not want to build up a tolerance.  (T. 279-80.)

15

Mekosch testified that she provides the childcare with help from her husband.  (T. 281.)  She stated that her daughters "are pretty self-sufficient."  (*Id*.)  She sleeps when the children are napping.  (*Id*.)  She drinks Mountain Dew because she thinks it helps with her sleepiness.  (*Id.*)

Mekosch explained that her mood is pretty even.  (T. 282.)  She does not feel suicidal, but she does not feel "up and excited about the world either."  (T. 284.)

Mekosch spent some time explaining the process for her examination by a consulting psychologists.  She explained that she was interviewed by the doctor for fifteen minutes and then was asked questions by an assistant.  (T. 285.)  She stated that she was "thrown off" due to the fact that she was being asked questions by the assistant and not the doctor.  She also stated that the exam was difficult because she had just met the doctor.  (*Id*.)  She was not sure whether she would have given the same responses if the doctor had remained the one asking the questions.  (*Id*.)

Mekosch stated she was having hallucinations due to the narcolepsy.  (T. 286.)  She explained that she can predict when she will be tired in the afternoon and can plan for that, but that at other times she may become tired unexpectedly.  (*Id*.)  She also explained that the doctors have not suggested any treatment for her fibromyalgia.  (T. 289.)  She stated that they have recommended exercising, but that she does not exercise because she is afraid she will aggravate the pain.  (*Id*.)

Dr. Frazin, the medical expert, testified after Mekosch.  (T. 290.)  He asked several questions about Mekosch's hallucinations, narcolepsy and medications.  (*Id*.)  Mekosch explained that she has hallucinations in the early morning hours, where she sees a man in the hallway and she becomes frightened for herself and her children.  (*Id*.)  During the hallucinations she can not move.  (*Id*.)  She describes it as being in between being asleep and being awake.  (*Id*.)  She also said that she gets

16

hallucinations during the daytime.  She said she will see cars moving that are parked when she is driving.

She said this happens mostly when she is very tired and/ or stressed.  (T. 291.)  She explained that she

has these hallucinations about four times a month.  (*Id.*)  She explained that the daytime hallucinations

affect her ability to drive and go out.  She does not loose consciousness, but that she sometimes falls.

(T. 291-92.)  She stated that she falls about four or five times a year.  (T. 293.)  She explained that

when she was taking Provigil, she stopped falling asleep at work and had fewer falls, but that it did not

affect the frequency of the hallucinations.  (T. 293-93.)  She said that she did not keep a diary of her

episodes.  (T. 293.)  Mekosch stated that she was not on any medication for narcolepsy.  (*Id.*)

Additionally, She stopped taking Flexeril because it made her too tired.  (T. 294.)

Based on Mekosch's answers, as well as a review of the record, Dr. Farkin determined that

Mekosch had three impairments: depression, fibromyalgia, and narcolepsy.  (T. 295.)  He explained

that the physical impairments, either alone or in combination, did not meet or equal a listed impairment.

(T. 296.)  He declined to discuss the severity of depression due to his lack of expertise.  (*Id.*)  He

noted that there was not good documentation in Mekosch's treatment record of the quantity of

hallucinations or narcoleptic attacks.  (T. 297.)  Considering Mekosch's muscle aches and pains, Dr.

Farkin limited her to sedentary work, lifting ten pounds occasionally and five pounds frequently.  (*Id.*)

He also noted limitations of standing and/or walking four hours in an eight-hour workday; sitting four

hours in an eight-hour workday; no repetitive tasks, repetitive reaching in any direction, or climbing;

occasionally balancing, stooping, kneeling, crawling, or crouching; handling, gross and fine manipulation,

and feeling unlimited; visual, hearing and speaking unlimited; no limitation for noise or vibrations; and

avoid temperature extremes as well as wetness and humidity and hazards such as machinery or heights.

(T. 297-98.)  He stated that he did not have the expertise to comment on limitations based on

psychiatric limitations, but noted that limitations mentioned in the record indicated limitations on

interacting with others.  (T. 298.)  He explained that he differed from Mekosch's treating physician on

these postural limitations because he saw no evidence in the record that supported further limitations.

(T. 300.)  He noted that her activities of daily living, with tending to childcare and household chores,

indicated a less restrictive limitation than opined by her physician.  (*Id.*)

  Steven Bosch testified as the vocational expert.  (T. 301.)  The ALJ posed a hypothetical to

Bosch based on Mekosch's age, past relevant work history, and education with limitations of sedentary

work, with lifting no more than ten pounds frequently and five pounds occasionally, no exposure to

hazards (unprotected machines, scaffolds, and heights), no exposure to temperature extremes, four

hours walking and standing, four hours siting, pushing and pulling unlimited, except for no repetitive

pushing or pulling or any other type repetitive motion, no climbing, occasionally stooping, kneeling,

crawling, crouching, balancing, work that is semiskilled or below, and with no high production goals to

limit stress.  (T. 308-09.)  Based on this hypothetical, the VE testified that a person with those kinds of

limitations would not be able to perform Mekosch's past relevant work.  (T. 309.)  He stated that her

past relevant work required more time on her feet than was allowed under the hypothetical.  (*Id.*)

Bosch testified that there were jobs in the local economy, however, that a person under the hypothetical

would be able to perform.  He listed receptionist, a low level semiskilled work that is sedentary, with

5,000 jobs available; information clerk, sedentary, semi-skilled low level work, with approximately

1,500 to 2,000 jobs available, and sorting occupations, sedentary and unskilled to low level semi-

skilled, with approximately 1,000 jobs available.  (T. 307.)  In addition, Bosch testified that unskilled,

sedentary work as a security monitor would also fit the hypothetical.  (*Id.*)  There are approximately

900 security monitor jobs available in the local economy.  (*Id.*)  The ALJ then posed a second

hypothetical that included all the limitations imposed by Dr. Moellentine.  (*Id.*)  Based on these

limitations, the VE stated that "sustained competitive work would not be possible."  (*Id.*)  The VE

testified that based on the first hypothetical, with the additional limitations of required rest periods of

two to three hours a day at unpredictable times, that full-time employment would be precluded.  (T.

308.)  The VE noted that full-time employment allowed for no more than two absences a month.  (*Id.*)

Finally, Jeffery Mekosch, Mekosch's husband testified.  (T. 309.)  He stated that he was being

treated for depression with Lexapro.  (T. 310.)  He stated that his depression was caused by a number

of things, but mainly by the stillborn birth of their baby.  He also testified that their 14-year-old daughter

was being treated with Lexapro for depression and that another daughter was experiencing symptoms

of depression.  (*Id.*)  He explained that there are two children home during the day while he is at work

and that all of the children are home on the weekend.  (T. 312.)  He stated that his wife takes care of

the children "the best she can" and that occasionally other family members will help.  (*Id.*)

Jeffery Mekosch said that Mekosch is not able to help out much with the household chores.

(T. 313.)  She is always tired and in pain "a good majority of the time."  (*Id.*)  It has gotten worse for

the past two to three years.  (*Id.*) He explained that she was much worse when she was working

because she would "do just what she could to get through the workday, and [she would] come home

and probably sleep most of the day."  (T. 314.)  He explained that she has bad days and tolerable

days, but not good days.  (*Id.*)  He states that she "[s]pends a lot of time just . . . off her feet, sleeping

a good majority of the time."  (T. 315.)  If she is having a bad day, and he is not home to help, they

have his sister or Mekosch's mother come over to help. (*Id.*)  He also noted that their oldest daughter helps out a lot. (*Id.*)

Jeffery Mekosch testified that he worries about Mekosch's driving because she falls asleep easily when she is at home. (T. 317.)  He stated that he has been with her when she was tired and driving and he talks with her to keep her awake. (*Id.*)  He explained that she had stopped using Provigil because they thought it might have caused them to loose the baby and then she stayed off of the medication because she was pregnant or breast feeding. (T. 318-19.)  He stated that the Provigil helped when she was taking it, but that she was "still pretty miserable." (T. 318.)  He also stated that she built-up a tolerance to the medication and that she needed to be off the medication for several months when they were trying to conceive a child. (T.320.)  He explained that because she was still breast feeding at the time of the hearing, she had not resumed her medication. (*Id.*)

## VI.    THE ALJ'S FINDINGS AND DECISION

On August 27, 2004 , ALJ Thomas issued an unfavorable decision denying Mekosch both DIB and SSI. (T. 32.)  In determining disability, the ALJ followed the sequential five-step procedure as set out in the rules.  *See* 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a).  The Eighth Circuit has summarized these steps as follows:

> The Commissioner must determine: (1) whether the claimant is presently engaged in "substantial gainful activity;" (2) whether the claimant has a severe impairment--one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the

claimant has the residual functional capacity [RFC][15] to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Fines v. Apfel*, 149 F.3d 893, 894 - 95 (8th Cir. 1998) (footnote added).

Based on the above steps, the ALJ determined that Mekosch had not engaged in substantial gainful activity at any time since her alleged onset date. (T. 18.) The ALJ next determined that Mekosch was suffering from the severe impairments of fibromyalgia, narcolepsy, and depression. (*Id.*) The ALJ, citing the testimony of Dr. Frazin, concluded that Mekosch's other impairments mentioned in the record, tendonitis, rhinitis and tension headaches, were not severe. (*Id.*)

Because Mekosch claimed limitations based on a mental impairment, the ALJ subsequently proceeded through the additional steps as outlined in § 404.1520a and § 416.920a. According to these sections, the ALJ must rate the claimant's degree of limitation in four broad functional areas. § 404.1520a(c)(3); § 416.920a(c)(3). These four areas are: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.* The ALJ must rate the degree of limitations on a five-point scale: None, mild, moderate, marked, and extreme. § 404.1520a(c)(4); § 416.920a(c)(4). If by using these ratings the ALJ determines that the impairment is severe, but does not meet a listed impairment, the ALJ must consider the claimant's mental limitations when he assess the claimant's RFC as described in step four of the determination procedure. § 404.1520a(d)(3); § 416.920a(d)(3).

---

[15]     A claimant's RFC is the most the claimant can still do despite the claimant's physical and/or mental limitations. 20 C.F.R. § 404.1545.

Here, the ALJ determined that Mekosch has mild restrictions on activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and has had no episodes of decompensation.  (T. 20.)  He noted that, despite her alleged need to nap and her slower pace, Mekosch was able to take care of her five children, her home, and herself.  (*Id.*)  Citing to evidence in the record, as well as the medical opinion of Dr. Frazin, and the description of her daily activities, the ALJ found that the severe impairments, including her mental impairments, either individually or in combination did not meet or equal a listed impairment under the regulations.  (T. 19, 21.)

The ALJ next proceeded to determine Mekosch's RFC.  (T. 21.)  In order to determine Mekosch's RFC, the ALJ considered her subjective complaints.  (*Id.*)  According to the Eight Circuit, the ALJ must consider several factors when evaluating a claimant's subjective complaints.  *See Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).  The ALJ listed the factors as described in *Polaski* and proceeded to evaluate Mekosch's subjective complaints based on the entire record.  (T. 21-28.)  The ALJ found that, due to several inconsistencies in the record, Mekosch's allegations of severe disabling pain and other alleged limitations were not fully credible.  (T. 28.)  The ALJ concluded that, weighing the opinions of the medical sources in the record, Mekosch has the RFC to lift ten pounds occasionally and five pounds frequently; limited to four hours of walking/standing; sitting four hours in an eight-hour workday; pushing and pulling unlimited for simple use but limited for repetitive, similar motions like manipulative tasks; no climbing; occasional stooping, kneeling, crawling, crouching, and balancing; unlimited for semi-skilled or below with no high production goals in order to reduce high stress; non exposure to hazards such as unprotected heights, machinery, scaffolds; and no exposure to extremes or

concentrations of cold, heat of similar environmental conditions.  (T. 28-29.)

Based on this RFC and considering the testimony of the vocational expert, the ALJ determined that Mekosch could not longer perform her past relevant work.  (T. 29.)  Taking into account Mekosch's age, education, and vocationally relevant past work experience, the ALJ concluded that Mekosch could perform a significant range of sedentary work.  (T. 30.)  Because there were limitations beyond those addressed in the guidelines, the ALJ considered the testimony of the VE listing jobs such as information clerk, sorter, and security monitor, in determining whether Mekosch was disabled.  (*Id*.)  The ALJ concluded that Mekosch "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and, accordingly, was not disabled as defined by the Social Security Act and agency regulations.  (*Id*.)

## VII.   EVIDENCE SUBMITTED AFTER THE ALJ'S DECISION AND THE APPEALS COUNCIL'S RESPONSE

Mekosch submitted a request for review by the Appeals Council.  (T. 6.)  Included in the submission was Mekosch's response to the consultive exam conducted by Dr. Wiger and a letter of contentions from Mekosch's counsel.  (*See* T. 255-61.)   In Mekosch's response to Dr. Wiger's assessment, Mekosch lists several areas in which she more fully explains her statements or comments made during the examination or disputes the doctor's opinion or conclusion.  (T. 255-58.)  She expresses her dissatisfaction with Dr. Wiger's use of an assistant to complete the examination.  (T. 258.)  She states: "I don't feel by spending only fifteen minutes with Dr. Wiger and then spending the rest of the forty five [sic] minutes with his female technician made for an adequate report.  Most of the stuff was misquoted and what he didn't know looked like it had been made up."  (*Id*.)  Mekosch's

counsel argues that (1) the ALJ failed to fully develop the record because he relied on a non-treating, non-examining medical expert's opinion in determining non-disability; (2) the examination by Dr. Wiger was invalid because he only spent 15 minutes with Mekosch; (3) the ALJ failed to give consideration to the "good cause" Mekosch provided for not remaining on her narcolepsy medication; (4) the ALJ failed to consider the adverse affects caused by her pain medication when considering her limited use of the medication; and (5) the ALJ failed to establish a proper mental RFC based on substantial evidence.  (T. 260-61.)  On February 15, 2005, the Appeals Council issued a notice of action denying a request for review.  (T. 7.)  The Appeals Council specifically noted that under SSA regulations, the consulting source was not required to spend the entire consulting time period conducting the examination of the claimant and that the consulting source is allowed to use office personnel to assist in completing the examination.  (*Id*.)  Thus, the Appeals Council concluded, Dr. Wiger's examination was within the regulations.  (*Id*.)

## VIII.   DISCUSSION

### A.   *Standard of Review*

This court will affirm the ALJ's findings that the claimant was not under a disability if the findings are supported by substantial evidence based on a review of the entire record.  *Haley v . Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support the decision."  *Id.* (quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)).  The review the court undertakes, however, must go beyond solely the examination of the record for evidence in support of the Commissioner's decision.  *Id.*  The court must additionally examine the record for evidence that detracts from that decision.  *Id.*

Nevertheless, as long as there is substantial evidence to support the decision, this court will not reverse it simply because substantial evidence exists in the record that would support a contrary outcome or because this court might have decided differently.  *See id.*; *see also Stormo v. Barnhart,* 377 F.3d 801, 805 (8th Cir. 2004) ("If substantial evidence supports the outcome, we will not reverse the decision even if substantial evidence also supports a different outcome.").

   B.   *Analysis of Decision*

   The Eighth Circuit has long emphasized that social security benefits hearings are non-adversarial proceedings.  *See Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004).  The ALJ must "develop the record fairly and fully, independent of the claimant's burden to press his case."  *Id.*  "The ALJ possesses no interest in denying benefits and must act neutrally in developing the record."  *Id.*  The goal of the administrative process is that "deserving claimants who apply for benefits receive justice." *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir.1994).  In disability determinations, however, the claimant bears the burden of proving her residual functional capacity.  *Goff v. Barnhart,* 421 F.3d 785, 790 (8th Cir. 2005).

   **1.   The ALJ's Assessment of the Opinions of Mekosch's Treating Physicians**

   Mekosch argues that the ALJ failed to identify any specific or legitimate reason for disregarding the opinions of her treating physicians, Drs. Leavell and Sahlberg, that she needed to nap for several hours a day.  (Pl. Mem. at 15.)  In addition, Mekosch argues that the ALJ failed to give the proper weight to Mekosch's treating psychiatrist's opinion with respect to Mekosch's mental limitations.  (Pl. Mem. at 26.)  "The regulations provide that a treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" *Prosch v. Apfel*, 201 F.3d 1010, 1012 -1013 (8th Cir. 2000) (citing 20 C.F.R. § 404.1527(d)(2)).  A physician's opinion, however, is not automatically controlling since it must be evaluated with the record as whole and may be discounted if it is internally inconsistent or inconsistent with the record as a whole.  *Guilliams v. Barnhart,* 393 F.3d 798, 803 (8th Cir. 2005); *Bentley v. Shalala*, 52 F.3d 784, 785-86 (8th Cir.1995).  An ALJ must provide "good reason" for discounting a treating source's opinion.  20 C.F.R § 404.1527(d)(2).

    a.    <u>The Weight Given to Mekosch's Treating Physician's Regarding a Need for Breaks</u>

Here, the ALJ granted considerable weight to Dr. Sahlberg's opinion regarding Mekosch's physical assessment.  (T. 24.)  The ALJ based the exertional and manipulative limitations in Mekosch's RFC on Dr. Sahlberg's January 2004 assessment.  (*Id*.)  The ALJ declined to give significant weight, however, to the postural limitations imposed by Dr. Sahlberg of never kneeling, climbing, balancing, stopping, crouching, or crawling.  (*Id*.)  The ALJ explained that he based this decision on Dr. Frazin's testimony that Mekosch's activities of daily living and the lack of documentation in the record did not support such extreme limitation.  (*Id*.)  The ALJ notes that Dr. Sahlberg had included a limitation of needing two to three naps a day.  (*Id*.)

Social Security regulations provide that an ALJ is to grant more weight to sources whose opinion is based on objective medical evidence or who provides an explanation for their opinion.  20 C.F.R. §§ 404.1527 (d)(3) and 416.927 (d)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we

will give that opinion.").   Although Dr. Sahlberg noted a need for naps in his assessment of Mekosch's

physical limitations, this limitation is not mentioned at any time during his treatment notes.   Neither is the

need for naps explained in the assessment.   Dr. Sahlberg does not clarify whether this limitation is based

on his own observation or statements made by Mekosch.

The ALJ also noted Dr. Leavell's assessment indicating a need for "two to three breaks at

unpredictable intervals during the day."  (T. 26.)  The ALJ observed this limitation was assessed at a

time when Mekosch was not taking her narcolepsy medication.  (Id.)  He further noted that Dr. Leavell

stated that Mekosch's impairments could be expected to last at least 12 months if she were off her

medication.  (*Id*.)  ALJ Thomas observed that Dr. Leavell reported that Mekosch was "doing well"and

taking caffeine for wakefulness and taking naps even though she was off her medication due to

pregnancy.  (T. 28.)  The ALJ concurred with and gave great weight to Dr. Leavell's opinion that

Mekosch's impairment would last 12 months, *if she were off her medications*.  (*Id*.)  The ALJ

commented that Mekosch has chosen to remain off her medication.  (*Id*.)  He additionally commented

that because Mekosch reported an incident where she almost dropped her baby due to an cataplexy

episode, it "seems illogical for the claimant to remain off her Provigil."  (*Id*.)  He also notes that

physician reports indicate that she does well when she is on her medication, but that she complained

when she was off her medication that her narcolepsy was "raging."  (T. 27.)

In addition, the ALJ noted that Mekosch's activities of daily living as reported by her and her

husband did not support the severity of impairments as stated by Dr. Moellentine. (T. 25.)  The ALJ

also noted that Mekosch's ability to travel from Minnesota to Las Vegas to attend a seminar on

narcolepsy was inconsistent with the severity of Dr. Moellentine's reported limitations.  (*Id*.)  The ALJ

27

observed that attending the conference would have required Mekosch to deal with the public, maintain

attention to schedules, deal with the stress of traveling, remember and carry out directions and/or

instructions, and act predictably in a social situation.  (*Id.*)

Although the ALJ did not directly address his decision not to include a limitation for needing

unscheduled breaks during the day, he did explain that Mekosch's "failure to resume these medications

is not suggestive of disabling impairments of narcolepsy or depression."  The Eighth Circuit has stated

that "[a]n impairment that is controllable does not support a finding of a disability."  *Johnson v. Apfel*,

240 F.3d 1145, 1148 (8th Cir.2001).  In addition, according to Social Security regulations, failure by a

claimant to follow a prescribed course of remedial treatment without good cause is grounds for denying

benefits.  *See* 20 C.F.R. § 416.930(b); *see also Flaherty v. Halter*, 182 F. Supp.2d 824, 829 (D.

Minn. 2001) ("A claimant's refusal to take medication that may mitigate his or her disability is

inconsistent with a claim of a disability.).  Here, the ALJ found that the severe limitations imposed by

Mekosch's narcolepsy and depression could be successfully treated with medication and would be

expected to last at least 12 months only if she were off her medications.  (*See* T. 26.)  He also found

that Mekosch's failure to take the prescribed medication indicated that the impairments were not so

severe as to be disabling.  (T. 26.)

The agency regulations allow a claimant to deny treatment for good reasons.  *See* 20 C.F.R. §

419.930(b).  Here, Mekosch has stated that she did not resume her prescribed medication because she

was breast feeding and that the drug adversely interacted with her chosen birth control method. (T.

273-74.)  In addition, she stated in her testimony that she was concerned that she would develop a

tolerance to the medication. (T. 274.)

The ALJ observes that Mekosch reported to her doctor that she had almost dropped her baby due to a cataplexy episode. (T. 26, 218.) The ALJ concluded that Mekosch's decision not to resume her prescribed treatment endangered the well-being of her child and, thus, was "illogical." (T. 26.) He notes that she has chosen to remain off her medication and that alternative exists to address her other concern regarding birth control.[16] (*Id*.) Thus, the ALJ failed to find Mekosch's statements credible that she was unable to comply with the prescribed course of treatment and use birth control. (*Id*.) Thus, the ALJ gave good reason as to why he discounted the impairments caused by narcolepsy and depression, including the need to take two to three unscheduled breaks a day.

In addition, the court finds that there is substantial evidence to support the ALJ's determination that Mekosch's failure to take prescribed narcolepsy medication indicate that the impairments from her narcolepsy are not disabling. Dr. Leavell stated several times that she did well on Provigil. (T. 127, 226, .) Dr. Macedo, from the Allina Clinic, also noted that her symptoms worsened when she was off her medication. (T. 136.) Dr. Leavell did note that she would need two to three unscheduled breaks a day, but he also noted that she was off her medication during pregnancy and that he did not know whether she had resumed taking her medication at the time he completed the assessment. (T. 124.) He also noted that "lifelong patients can achieve improvement with naps [and] medication." (*Id*.)

An overall review of the record also indicates that Mekosch's narcolepsy was not so severe as to be disabling. Mekosch's major complaints and reasons she was seen by her treating physicians

---

[16]     The court notes that Mekosch's psychiatrist, Dr. Moellentine, encouraged her to consider options to breast feeding because if she were to restart her medications "it would be preferable that she not be breast-feeding." (T. 223.)

during the alleged disability period were mainly for sinus and urinary tract infections, allergies,

headaches, and muscle and back pain.[17]  (T. 116, 118, 131, 135, 136, 144, 145, 200, 202, 205, 209,

214.)  She sought treatment for her narcolepsy infrequently.  (T. 127, 226.)  She reported worsening

conditions for her narcolepsy only when she was off her medication.  (T. 195.)  In November 2003,

she was advised by her doctor not to drive due to her untreated narcolepsy.  (T. 218.)  At the time of

the hearing, however, Mekosch stated that she was still driving.  (T. 271.)  In addition, Mekosch

testified that she never left her five year old and infant unattended during the day, but that she naps

when they did.  (T. 282.)  This is inconsistent with the limitation imposed by Dr. Sahlberg of having to

take unannounced rest periods of two to three hours daily.  (*See*. T. 233.)

   Moreover, Mekosch's reasons for declining to take her narcolepsy medication  is circumspect

and suggests that her untreated narcolepsy is not as severe as alleged.  Although Mekosch testified that

she was not taking Provigil because it conflicted with her birth control medicine Depo-Provera (T. 273-

74), there is no indication in her medical records of this.  It is noted several times throughout her

treatment notes from the Allina Clinic, that she uses withdrawal and spermicide as birth control

methods.  (See T. 131, 138, 140, 145, 196, 201, 209, 215.)  In addition, Mekosch stated during her

testimony that the effectiveness of Provigil was wearing off and that she was becoming tolerant to the

medication and that her doctors had to increase the dosage to increase the effectiveness.  (T. 275.)

She suggested that this is one reason why she has chosen not to resume her medication.  (*Id*.)  There is,

however, no evidence of this beyond her and her husband's testimony.  The concern for tolerance or a

_____

[17]    Prior to her disability date, she also presented at her clinic with complaints of sinusitis, allergies, urinary infections, and muscle, head and neck pain.  (T. 151, 152, 154, 156, 158, 160.)

concern that the Provigil was losing effectiveness is never noted in the treatment records or reports or assessment by her doctors.  The dosage of Provigil was altered once in September 2001 when Mekosch presented at the clinic complaining of nausea, headache, and muscle pain.  (T. 161.)  The dosage of Provigil was modified from 300 mg per day to 200 mg taken twice a day.  (*Id.*)  There is no indication as to why the dosage of medication was modified in this manner.  (*See id.*)  The dosage of 200 mg twice daily has remained the same throughout the alleged disability period.

The court also considers that Drs. Sahlberg and Moellentine have made statements that are inconsistent with disability.  On July 24, 2002, Dr. Sahlberg suggested that Mekosch would be able to return to work on August 4, 2002.  (T. 144.)  On November 3, 2003, Dr. Moellentine noted that he would support short term disability while she was breast feeding and unable to take her medication, but once the baby was weaned, "we can assess a return to work schedule."  (T. 218.)

After a review of the entire record, the court concludes that the ALJ reasonably concluded that Mekosch's allegations of the severity of her symptoms of narcolepsy, including the need to take several naps a day, were not consistent with her failure to resume a highly effective course of treatment and not consistent with other evidence in the record.  Additionally, the court finds that the ALJ gave good reason why he discounted the treating physicians' opinions that Mekosch was limited by needing two to three unscheduled breaks during the day or that she needed rest periods of two to three hours daily at unannounced times.

      b.    The Weight given to Mekosch's Treating Psychiatrist in the ALJ's Assessment of
           Mekosch's Mental Residual Functional Capacity

Next, Mekosch argues that the ALJ failed to adequately assess Mekosch's mental residual

function.  She argues that the ALJ's basis for rejecting Mekosch's treating psychiatrist's opinions is "specious" and amounts to "rank speculation."  (Pl. Mem. at 26.)  The ALJ determined that Mekosch "is 'mildly' restricted in her activities of daily living; has 'mild' difficulties in maintaining social functioning; has 'moderate' difficulties in maintaining concentration, persistence or pace; and has had no episodes of decompensation."  (T. 20.)  ALJ Thomas explained that he gave Dr. Moelletine's opinion "little weight" because "it contains conflicting statements, is not supported by the record as a whole, and appears to be based primarily on the claimant's complaints."  (T. 25.)  As stated above, these are sufficient reasons for an ALJ to discount a treating psychiatrists's opinion.  *See Bentley v. Shalala*, 52 F.3d 784, 785-86 (8th Cir.1995) (noting that a treating physician's opinion may be discounted if it is not based on medically acceptable clinical and laboratory diagnostic techniques or is internally inconsistent or inconsistent with the record as a whole).

Dr. Moellentine, Mekosch's treating psychiatrist completed a residual functional capacity form on November 3, 2003.  (T. 227.)  He indicated that Mekosch had a very good or unlimited ability to follow work rules and function independently; a good ability in her use judgement and interaction with a supervisor; a fair ability to relate to coworkers and deal with the public; and poor to no ability to deal with work stress or maintain attention or concentration.  (T. 227-28.)  Dr. Moellentine notes severe depression, narcolepsy and fibromyalgia to support these limitations.  (T. 228.)  In addition, he notes a poor to no ability to understand remember and carry out complex or detailed but not complex instructions and a fair ability to understand remember and carry out simple job instructions.  (*Id*.)  He reports good ability to maintain personal appearance; fair ability to behave in an emotionally stable manner and relate predictably in social situations; and poor to no ability to demonstrate reliability.  (T.

229.)  He also reports that she should not work with people, drive for long distances, or be exposed to minimal stress.  (*Id*.)  On January 19, 2004, Dr. Moellentine wrote a letter "to clarify" Mekosch's disability period as July 15, 2002, through July 17, 2004, with a review for medical improvement at that time.  (T. 230.)

The ALJ points out several inconsistencies in the assessment itself as well as between Dr. Moellentine's assessment, the treatment his treatment notes, and other evidence in the record.  (T. 25.)  First, Dr. Moellentine indicated on the assessment that Mekosch suffered from disabling severe depression.  Dr. Moellentine's treatment notes indicate, however, do not indicate severe depression.  For example, on October 16, 2002, Mekosch rated her depression at 5/10, she was off her medications due to a recent pregnancy, and she was suffering from bereavement due to the pregnancy resulting in a stillbirth.  (T. 129.)  Her affect, however, was described as fairly calm, stable and pleasant, with a moderately depressed mood.  (*Id*.)  Dr. Moellentine noted that Mekosch would start Wellbutrin the following morning and she was to return in two months for a follow-up visit.  (*Id*.)

In addition, during Mekosch's next psychiatric visit on March 21, 2003.  Dr. Moellentine notes that Mekosch is not on any psychotropic medications due to her pregnancy and that her depression is moderate. (T. 222.)  He described her affect as "somewhat bland but mild, reactive and stable and appropriate to content of interview."  (T. 222-23.)  He does note that she is unhappy because she has been denied disability twice and must wait six months before appealing.  (T. 222.)

Furthermore, on July 11, 2003, Dr. Moellentine states that Mekosch reports depression at 8/10.  (T. 220.)  He also notes, however, the she continues to be off her medication for depression.  (*Id*.)  Finally, on November 3, 2003, Dr. Moellentine reports that Mekosch did "not appear tearful,

psychotic or depressed." (T. 219.) She was still not taking her medication for depression although she had given birth in August. (T. 218.) She denied feeling depressed, but described a feeling of "no mood." (*Id.*) Dr. Moellentine did note that her sleep disorder sounded to be worse and that it was difficult "raising five children ages 5 to 14, in addition to her new infant." (T. 219.) He suggested a three month follow-up visit. (*Id.*)

None of these ongoing observations in Dr. Moellentine's treatment notes indicate that Mekosch suffers from depression to the severity as to be disabling, as indicated in his assessment. In fact, on November 3, 2003, although he states that he supports short term disability, he discusses the need to complete a return to work assessment following her resuming her medications. (T. 218.)

Next, Dr. Moellentine opines in his assessment that Mekosch is unable to work with people and lacks judgment. (T. 229.) His treatment notes, however, give no indication of an inability to relate to others. In fact, her affect is described consistently as appropriate, with no agitation, calm and cooperative. (T. 219, 221, 223.) Additionally, the treatment notes indicate "insight is good and her current judgment appears intact."

Furthermore, Dr. Moellentine's assessment seems internally inconsistent as he indicates that Mekosch has an unlimited or very good ability to follow work rules, but then states that her ability to understand, remember and carry out simple job instructions is fair, and that she would be unable to carry out detailed or complex job instructions.

Finally, Dr. Moellentine's assessment is inconsistent with other evidence in the record. For example, he states that she is unable to work with others. Mekosch states, however, that she has two close friends and that she and her husband have "lots of casual friends," although they do not socialize

34

much.  (T. 98.)  She gets along well with relatives.  (*Id*.)  She does not have problems with authority

figures.  (*Id*.)  Her husband describes her ability to get along with others:  "She gets along very well with

me [and] others.  She's a good judge of people [and] personality and is willing to help friends in need.

She is a good listener."  (T. 102.)  He reported that she sees two close friends a couple times a week.

(*Id*.)  He stated that she gets along well with groups.  (*Id*.)  Additionally, in the letter prepared by Dr.

Moellentine to "clarify the period of disability," Moellentine states that Mekosch's limitations, as

described in his assessment, began on July 15, 2002 "with a review of medical improvement after

7/15/2004."  There is no record that Dr. Moellentine was treating Mekosch as early as July 15, 2002.

In addition, in July 2002, Dr. Sahlberg notes that Mekosch would be able to return to work in August

4, 2002, after treatment for a sinus infection.  (T. 144.)

Accordingly, the court concludes that Dr. Moellentine's opinion is internally inconsistent,

inconsistent with other medical evidence, and inconsistent with the record as a whole.  Thus, it was

proper for the ALJ to grant little weight to Dr. Moellentine's assessment describing such extreme

limitations and restrictions.  The court finds that the ALJ properly followed the regulations for assessing

Mekosch's mental functional capacity.  Furthermore, there is substantial evidence in the record that

indicates the ALJ appropriately limited Mekosch to jobs that had "no high production goals in order to

reduce high stress."

## 2.      The ALJ's Determination of Mekosch's RFC

Finally, Mekosch argues the ALJ's RFC is not based on any medical evidence and therefore is

improper and not based on substantial evidence.   The claimant carries the burden in establishing her

RFC.  *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).  The ALJ, however, "bears the

primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000).  Although there must be some medical evidence to support the ALJ's determination of a claimant's RFC, the ALJ must look to all relevant evidence in the record to determine the claimant's ability to function in the workplace. *Masterson*, 363 F.3d at 738.  All relevant evidence includes medical records, observations of treating and examining physicians and third persons, reports by consulting experts, and the claimant's own descriptions of his or her limitations.  *Id*. at 737.

Although the ALJ's RFC does not directly match the limitations as imposed by Mekosch's treating physicians, the court finds the ALJ's RFC is supported by substantial evidence.  *See Flaherty v. Halter*, 182 F. Supp.2d 824, 846 (D. Minn. 2001).  The ALJ properly discounted aspects of the treating physician's opinions and adopted those portions in which he found consistent with the record. (*See* T. 24.)  Additionally, the ALJ properly examined the all the evidence in the record.  The ALJ noted that Mekosch was able to care for her five children during the week and on the weekend while her husband worked, that she was able to travel to a conference in another state, and that she reported preparing three meals a day, talking on the phone, watching television for several hours, talking to neighbors twice a week, and watching movies and going out to eat three times a month.  (T. 20, 24-25.)  He also notes that Mekosch told Dr. Wiger that she spends two to three hours on the computer, drives, and manages her own checking account.  (T. 25.)  The ALJ considered Mekosch's failure to return to an effective treatment plan.  He also considered the inconsistencies in the record that detracted from Mekosch's credibility.  (T. 27.)  The ALJ reviewed the entire record, determined the credibility of

witnesses, and weighed the medical evidence.[18]   Accordingly, the court finds that the ALJ determined a proper RFC, posed a proper hypothetical to the VE, and properly relied on the VE's testimony to determine that Mekosch failed to meet the requirements under the agency regulations for a period of disability.

## VIII.   CONCLUSION AND RECOMMENDATION

This court must affirm the ALJ's decision if it is supported by substantial evidence.  *See Flaherty*, 182 F. Supp.2d at 846.  Based on the preceding discussion, the court finds that the ALJ's determination that Mekosch failed to meet the requirements for DIB and SSI is supported by substantial evidence in the record.  The court, therefore, recommends that Mekosch's Motion for Summary Judgment [Docket No. 15] **be denied** and the Commissioner's Motion for Summary Judgment [Docket No. 19] **be granted**.

Dated: <u>April 12, 2006</u>

---

[18]      Mekosch argues that the ALJ failed to take into consideration that she had been previously found to be disabled from 1987 to 1994.  (Pl. Mem. at 20.)  She states that benefits, presumably on the basis of narcolepsy, were awarded from the time she was 13 years old until she was 20 years old.  (*Id*.)  She suggests that the ALJ should have found that this prior finding of disability weighted toward finding Mekosch disabled at this time.  The court notes, however, that there is nothing in the record that indicates Mekosch was previously found disabled in 1987 or that she had been granted disability benefits due to narcolepsy at any time in the past.  There is evidence that Mekosch received disability benefits from May 1993 through December 1994.  (T. 85.)  There is no indication why benefits were allowed at that time or why they were terminated.  (*See id*.)

s/ Arthur J. Boylan
Arthur J. Boylan
United States Magistrate Judge


## NOTICE

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **April 26, 2006.**